Opinion of the court delivered by
Judge Catron.
In March, 1817, M’Lemore entered 100 acres of land, which in October, 1817, was granted to him, lying in Hickman county, south of- Duck river, north and east of the congressional reservation line, within the bounds of the first surveyor’s district of Tennessee, and within the bounds of the land reserved to the Chickasaw tribe of Indians, previous to the treaty of September, 1816. On the 17th July, 1824, Wright entered the same land, at 12i cents per acre, with the entry taker of Hickman county, by virtue of the act of 1823, ch. 49: on the 18th day tof August, 1825, M’Lemore filed his caveat, in the circuit court of Hickman county, to prohibit a grant from issuing to Wright. At March term, 1826, the caveat was dismissed by the circuit court, and M’Lemore’s grant adjudged void, and a grant ordered to be issued to Wright; from which decision M’Lemore appealed to this court.
The single question presented by the record is, could the entry and grant communicate any title to M’Lemore, for lands lying within the boundary of the lands acquired from the Chickasaws by the treaty of 1816?
The first surveyor’s district by the act of 1806, ch. 1 sec. 1, is limited to the military boundary as prescribed by the act of 1783, ch. 3, sec. 7; beginning where the Cumberland river crosses the Virginia line, thence south 55 miles y thence west to the Tennessee river; thence down the same to the Virginia line, and east with the same to the beginning.
By the compact of 1806, ch. 10, the United States reserved certain lands, not subject to location by Tennes. see, but they lay south and west of the military boun. dary, beginning where Elk river crosses our southern boundary, then north fto the military boundary line» *327 and west with the same to Tennessee river, down Ten- , ,. - . , _ , , nessee to our northern boundary, and west with this to the Mississippi. Hence Tennessee was free to appropriate this land for the satisfaction of warrants at the time M’Lemore’s entry was made, which it is admitted was upon a genuine North Carolina warrant. The question then is, was the country in the first district acquired in 1816 from the Chickasaws, open to location by North Carolina warrants in 1817? By the treaty of 1805, (Laws U. States, vol. 1, p. 356,) the Chickasaw boundary is fixed running up Duck river. The cession act of 1806, ch. 10, which authorizes Tennessee to issue grants upon North Carolina warrants, provides, “that nothing therein contained shall be construed so as to affect the Indian title.” Without the passage of the act of 1806, ch. 10, by Congress, we were not authorized to issue grants upon warrants; the assent of Congress was expressly imposed upon us by our compact with North Carolina of 1804; ch. 14.
After the passage of the act of Congress, by the 1 ch. of the act of 1806, surveyor’s districts were laid off, and the mode of,entering, surveying, and granting lands prescribed; but the acts impliedly prohibit entries being made upon the lands reserved to the Indians, (sec. 4,) by instructing the surveyors to section their districts in squares of six miles, for lands to which the Indian title had been extinguished, but to stop at the Indian boundary: by the fifth section, the surveyor is to lay down and survey the old grants and entries with reference to the sectioninglines,so as to lay down in each section 640 acres for the use of schools, which is one of the conditions of the act of 1806, of Congress, upon which we were permitted to appropriate the land. To effect this purpose alone, it was absolutely necessary to section the country. If no land fit for cultivation could be found in the section of six miles square to locate the school tract upon, the surveyor was compelled to certify the same to the next Legislature, that provision might be made. Of the sectioning, a map was to be made, and this to form the guide' to all *328 Qnterers of the lands open to location. Copies of this we~e, to be deposited with the registers at Knoxville ar Nashville.
By section 10, every entry was required to connect itself with the section by calls, so that it could be laid down upon the plan, soon as made, for the direction of others; and although this is repealed by the 39th- section of the land law of 1807 to some extent, still, the plan was the guidein 1817, to the lands open to entry.
That from the passage of the land law of 1806 to 1817, there was no legislation having directly for the object, the appropriation of the lands, of the Chickasaw Indians, need only be stated to be admitted. But it is said, nothing in the acts of assembly ■prohibited, this, after the lands were ceded by the treaty of 1816. To which it may be replied, that the treaty conferred no powers not previously possessed, upon the officers of Tennessee deputed to perfect titles to North Carolina claimants; this could alone be done by the Legislalure of Tennessee. It was by powers conferred, not powers withholden, they were authorized to receive entries and issue grants, and no power had been communicated to our executive officers to appropriate the lands west of Duck river, in 1817: they were open to appropriation at the will and pleasure of the Legislature only. It is insisted that this grantis fair upon its face, and by the 37th section of the act of1807, ch.2,cannot nowbe disturbed. This section was repealed by the act of 1812,-ch. 72; were it not repealed, this grant is not within the provision, for it shews upon its face, that it was located upon a spot not subject to be granted, and therefore not fair. Furthermore, the provision only applied to grants issued by .North Carolina, previous to 1807. It is urged that the courts of Tennessee cannot pronounce a grant void. Suppose the surveyor of the 1st district had received an entry immediately after the treaty oí 1818, for lands lying in the western district, surveyed the same, and the register had issued a-grant for the land, would it not be most absurd to say it was valid because formal upon its face? No *329 power whatever was vested in the officers of the state to permit such entry or make such grant, and therefore it would be as void, as if made by any third person. Here the Indian treaty of 1805, was the paramount law of the land, and fixed the bounds of the first district. The state never authorized her officers to receive theseentries,which power they gratuitously claim, and cannot lawfully exercise; therefore the grant is just as void as if issued for lands in the western district by virtue of an entry made in the first district. We think the judgment should be affirmed.
Judgment affirmed.